# UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 4:23-cr-00171-DCN |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER RE: GOVERNMENT'S MOTION FOR DETENTION (DKT. 5)** |
| vs. | |
| BERNARDO FIGUEROA-ALVAREZ, | |
| Defendant. | |

Pending before the Court is the Government's Motion for Detention (Dkt. 5). The Court, having conducted an evidentiary hearing during which it heard additional proffers and argument from the parties, is fully apprised and enters the following order.

I.   Factual Background

Defendant is a 37-year-old citizen of Mexico. Sometime in 2007, he illegally entered the United States and became a resident of Eastern Idaho. He has resided in Eastern Idaho for approximately the last 16 years. Defendant lives in Rigby, Idaho with his girlfriend of 5 years. He has three children from a prior marriage – all born in the United States and United States citizens – who reside with their mother in Idaho Falls, Idaho. Defendant has visitation rights and pays monthly child support.

Prior to his arrest, Defendant was employed at Quality Pros Paver in Idaho Falls for 3 years. His financial resources consist of approximately $4,500 in savings and a 2014 pickup truck for which he makes monthly payments.

Most of Defendant's immediate family – his parents and siblings – live in Mexico. His sister's husband was issued a visa and legally resides in the United States.

**MEMORANDUM DECISION AND ORDER - 1**

Defendant has been deported or removed from the United States to Mexico on four occasions: December 1, 2011; December 14, 2018; February 23, 2019; and April 12, 2019.  Each time, he illegally reentered the United States and returned to Eastern Idaho or its vicinity.

Defendant has four prior criminal convictions, three misdemeanors and one infraction. On July 4, 2014, he was convicted of misdemeanor failure to purchase a driver's license and paid a $226 fine.  On June 10, 2015, he was again convicted of misdemeanor failure to purchase a driver's license and paid a $257 fine.  On April 2, 2016, he was convicted of an open container by a passenger infraction and paid a $72 fine.  On January 1, 2019, he was convicted of misdemeanor illegal entry into the United States and was sentenced to serve 30 days in prison. There is no evidence in the record that Defendant failed to appear for any court proceedings as required or violated any pretrial or post-sentence conditions.

On June 11, 2023, Defendant was arrested in Bonneville County for misdemeanor driving under the influence; that charge remains pending.  As a result of the arrest, Bureau of Immigration and Customs Enforcement ("ICE") agents encountered Defendant and this prosecution ensued.

On June 27, 2023, the grand jury returned an indictment charging Defendant with one count of illegal reentry after removal, in violation of 8 U.S.C. § 1326(a) and (b).  (Dkt. 2).  On June 30, 2023, the Government filed the instant Motion for Detention.  (Dkt. 5).  On July 3, 2023, the Court convened an initial appearance and hearing on the instant motion.

II.    The Bail Reform Act

A.    Gatekeeping Under Section 3142(f)

The Bail Reform Act of 1984 (the "Act") repealed the Bail Reform Act of 1966.  S. Rep. No. 225, 98th Cong., 1st Sess. (1983).  The principal reason for the reform was to address dangerousness in the federal pretrial bail decision:

**MEMORANDUM DECISION AND ORDER - 2**

> Many of the changes in the Bail Reform Act [of 1966] incorporated in this bill reflect the Committee's determination that Federal bail laws must address the alarming problem of crimes committed by persons on release and must give appropriate recognition to the danger a person may pose to others if released.

*Id.* at 3.  For the first time, then, the Act authorized pretrial detention for a "a small but identifiable group of particularly dangerous defendants . . . ."  *Id.* at 6.  Congress stressed that "[t]he decision to provide for pretrial detention is in no way a derogation of the importance of the defendant's interest in remaining at liberty prior to trial."  *Id.* at 7.  This liberty interest, however, would henceforth be balanced against the "societal interests" in protecting the community from dangerous recidivists, as well as those defendants who threaten "the integrity of the judicial process."  *Id.*

To balance a defendant's fundamental interest in pretrial liberty with adequate protection of the community and the integrity of the judicial process, Congress authorized detention hearings only in limited circumstances.  *Id.* at 20 ("[T]he requisite circumstances for invoking a detention hearing in effect serve to limit the types of cases in which detention may be ordered prior to trial."); *see also United States v. Salerno,* 481 U.S. 739, 747 (1987) (recognizing that "[t]he Bail Reform Act carefully limits the circumstances under which detention may be sought to the most serious of crimes.").  Section 3142(f) of the Act specifies those circumstances:

> Detention Hearing. — The judicial officer shall hold a hearing to determine whether any condition or combination of conditions set forth in subsection (c) of this section will reasonably assure the appearance of such person as required and the safety of any other person and the community—
>
> > (1) upon motion of the attorney for the Government, in a case that involves—
> >
> > > (A) a crime of violence, a violation of section 1591, or an offense listed in section 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed;

**MEMORANDUM DECISION AND ORDER - 3**

(B) an offense for which the maximum sentence is life imprisonment or death;

(C) an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), or chapter 705 of title 46;

(D) any felony if such person has been convicted of two or more offenses described in subparagraphs (A) through (C) of this paragraph, or two or more State or local offenses that would have been offenses described in subparagraphs (A) through (C) of this paragraph if a circumstance giving rise to Federal jurisdiction had existed, or a combination of such offenses; or

(E) any felony that is not otherwise a crime of violence that involves a minor victim or that involves the possession or use of a firearm or destructive device (as those terms are defined in section 921), or any other dangerous weapon, or involves a failure to register under section 2250 of title 18, United States Code; or

(2) upon motion of the attorney for the Government or upon the judicial officer's own motion in a case, that involves—

(A) a serious risk that such person will flee; or

(B) a serious risk that such person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror.

18 U.S.C. § 3142(f). In shorthand form, detention hearings are authorized only if the defendant

(i) is charged with one of five categories of serious crimes – crimes that, if the defendant were to

recidivate while on pretrial release, pose the greatest risk to community safety; or (ii) presents a

serious risk of flight, or a serious risk of obstruction or intimidation – acts that present the greatest risk to the integrity of the judicial process.[1]

Absent one of these serious circumstances that would automatically trigger a detention hearing, a defendant *must* be released on personal recognizance, unsecured appearance bond, or conditions.  18 U.S.C. § 3142(a).[2]  This is true whether the defendant is otherwise dangerous. *See United States v. Twine,* 344 F.3d 987 (9th Cir. 2003) ("We are not persuaded that the Bail Reform Act authorizes pretrial detention without bail based solely on a finding of dangerousness. This interpretation of the Act would render meaningless 18 U.S.C. § 3142(f)(1) and (2)."); *United States v. Dillard*, 214 F.3d 88, 96 (2d Cir. 2000) ("The question whether the defendant poses a danger to the safety of the community . . . cannot be considered unless the defendant is found to be eligible for detention under subsection 3142(f).  A defendant who is not eligible must be released, notwithstanding alleged dangerousness.").

---

[1] *See* 131 Cong. Rec. S00000-12, 1985 WL 707152, at 53 ("Nothing in the proposed amendment [to the Act] is designed to create an implication that a court lacks inherent detention authority to deal with a situation in which. . . the defendant has threatened or plans to injure or intimidate a juror or witness or plans to flee.  Cases arising under the 1966 Bail Reform Act recognized an inherent right of the trial court to protect the integrity of the judicial process by ordering detention if necessary in such circumstances [citations omitted] . . . and nothing in the 1984 Act should be deemed to limit that power.").

[2] Section 3142(d) also permits temporary detention – of no more than 10 days – to permit authorities to determine whether to take the defendant into custody on other charges, violations, or immigration detainers. 18 U.S.C. § 3142(d).  As it relates to aliens, § 3142(d) authorizes "temporary detention to permit . . . deportation, or exclusion" if the judicial officer determines that the defendant "is not a citizen of the United States or lawfully admitted for permanent residence" and "may flee or pose a danger to any other person or the community." *Id.* at §§ 3142(d)(1)(B), (d)(2).  In such cases, the Act further provides: "If the official fails or declines to take such person into custody during that period, such person shall be treated in accordance with the other provisions of this section, notwithstanding the applicability of other provisions of law governing release pending trial or deportation or exclusion proceedings." *Id.* at § 3142(d). Where, as here, immigration authorities bring the defendant to the attention of federal prosecutors, and not the other way around, the temporary detention provisions of § 3142(d) do not apply.  *See United States v. Villatoro-Ventura,* 330 F. Supp. 3d 1118, 1123 (W.D. Iowa 2018).

**MEMORANDUM DECISION AND ORDER - 5**

Section 3142(f), then, imposes on the magistrate courts a gatekeeping function at initial appearance. *See United States v. Subil*, 2023 WL 3866709, at *4 (W.D. Wa. June 7, 2023) ("Thus, Section 3142(f) serves an important 'gate-keeping function,' [citation omitted] by preventing even the opportunity to seek detention in all but a certain, narrow subset of cases. Indeed, the Supreme Court's holding that detention imposed by the Act is regulatory, not punitive—and therefore constitutional—is premised in part on the Act's careful limits on when a detention hearing is available.") (citing *Salerno,* 481 U.S. at 749).

 B. <u>Serious Risk of Flight</u>

The crime of illegal reentry after removal, in violation of 18 U.S.C. § 1326, is not one of the five serious crimes enumerated in § 3142(f)(1). Accordingly, in such cases, the Government is entitled to a detention hearing upon its request *only* if it can establish that the defendant poses a serious risk of flight or obstruction/intimidation under § 3142(f)(2). Relevant here is whether the Defendant is a serious risk of flight.

A threshold question is whether risk of flight differs from risk of non-appearance referenced elsewhere in the Act. *Compare* 18 U.S.C. § 3142(f)(2)(A), with §§ 3142(e)-(g).[3] In addressing this question, the Court is guided by basic principles of statutory interpretation. "A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Hibbs v. Winn*, 542 U.S. 88, 101 (2004). "[E]very word and every provision [of a statute] is to be given effect [and that n]one should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence." *Nielsen v. Preap*, 139 S. Ct. 954, 969 (2019) (quoting Antonin Scalia & Bryan

---

[3] Herein, the Court (i) uses the term "serious risk of flight" interchangeably with the actual statutory language in § 3142(f)(2)(A): "serious risk that such person will flee"; and (ii) uses the term "risk of non-appearance" interchangeably with the actual statutory language in §§ 3142(e)-(g): risk of "[non-]appearance of the person as required."

**MEMORANDUM DECISION AND ORDER - 6**

Garner, Reading Law: The Interpretation of Legal Texts, at 174 (2012)).  Each "word Congress uses [in a statute] is there for a reason." *Advocate Health Care Network v. Stapleton*, 581 U.S. 468, 477 (2017).

On this question, the case of *United States v. White,* 2021 WL 2155441 (M.D. Tenn. May 27, 2021), is instructive.  Therein, the district court considered the "facial differences between the words [flight and non-appearance]" and "the structure of the Bail Reform Act, which suggests an intentional differentiation between the two concepts."  *Id.* at *10.  The district court observed:

> [I]t is clear that flight and nonappearance are not simply interchangeable names for the same concept, nor are they merely different degrees of the same type of risk. In the context of measuring and managing risks, many defendants who merely fail to appear differ in important ways from their fugitive cousins Precision about these distinctions is constitutionally mandated and statutorily required.

*Id.* (quoting Lauryn P. Gouldin, *Defining Flight Risk,* 85 U. Chi. L. Rev. 677 (2018)); *see also United States v. Runsdorf,* 2022 WL 303548, at *4 (S.D. Fla. Jan. 24, 2022) ("And, the question whether there is a serious risk that the defendant will 'flee' is also distinct from the later inquiry whether conditions of release will reasonably assure the defendant's 'appearance' as required."); *United States v. Gibson,* 384 F. Supp. 3d 955, 965 (N.D. Ind. 2019) ("While Congress chose to use 'serious risk of flight' in subsection (f)(2)(A) to describe the limited scenario under which a defendant will face a detention hearing, Congress settled on very different language when describing the analysis courts must undertake once a detention hearing goes forward.").

The district court in *White* concluded that risk of flight is narrower than risk of non-appearance, and that the distinction hinges on intention:

> It well may be that someone can pose a risk of "non-appearance" without posing a risk of "flight."  The latter term seems to connote intentional and active movement to put oneself beyond the

> supervision of the court and the reach of criminal proceedings; this connotation is not inherent in the notion of "non-appearance," a term broad enough to cover negligent or other unintentional, and not just active and intentional, failures to appear.  It would seem that "risk of flight" is a subset of "risk of non-appearance"—meaning that, depending on the circumstances suggesting a serious risk of non-appearance, a risk of non-appearance may not entail a risk of flight.

*White,* 2021 WL 2155441 at *8.  The Court agrees with this reasoning and holds that risk of flight is distinguishable from, and more narrow than, risk of non-appearance.

Having distinguished risk of flight from risk of non-appearance, the next question is what does "serious risk of flight" mean?  Because courts interpreting the Act have conflated risk of flight with risk of non-appearance, risk of flight has evaded definition.  *See White,* 2021 WL 2155441 at *10 (observing that the court "is writing on a largely blank slate with respect to the meaning of 'flight risk.'").  One district court, and Professor Gouldin, define it narrowly: a risk that the defendant will leave the jurisdiction to avoid prosecution.  *United States v. Alvarenga-Canan,* No. 1:23-cr-00042-BLW, Motion Hearing (March 2, 2023), Tr. at 15 (Dkt. 26) (Winmill, J.); Gouldin, 85 U. Chi. L. Rev. at 677, 683.  The *White* district court defines it more broadly: a risk that the defendant intentionally will avoid appearing for court.  *White,* 2021 WL 2155441 at *10.  The Court sees merit in both definitions.

The Court agrees that flight – as that term is commonly understood – involves active movement.  But flight is not limited to movement outside of the jurisdiction; it can also involve secreting oneself within the jurisdiction by moving to a different locale therein.  *See* Nolan, Joseph R. & Nolan-Haley, Jacqueline M., *Black's Law Dictionary*, at 639-40 (6th ed. 1990) (defining "flight from prosecution" as "[t]he evading of the course of justice by voluntarily withdrawing one's self in order to avoid arrest or detention, or the institution or continuation of criminal proceedings, regardless of whether one leaves [the] jurisdiction."); *see also White,* 2021 WL 2155441 at *8 (acknowledging that a defendant can "actually or at least metaphorically [be]

**MEMORANDUM DECISION AND ORDER - 8**

'on the run' [ ] within the jurisdiction.").  Moreover, flight must be intentional, and not the result of mere negligence or mistake.  *See White,* 2021 WL 2155441 at *8; *United States v. Cobix-Espinoza*, 2023 WL 1860982, at *2 (E.D. Ky. Feb. 9, 2023) (flight involves "voluntary action") (citing *United States v. Ailon-Ailon*, 875 F.3d 1334, 1338 (10th Cir. 2017)).  Finally, the risk of flight referenced in the Act is a "serious" risk of flight.  "Serious" has a plain meaning.  *See Black's Law Dictionary* at 1367 (defining "serious" as "important, weighty, momentous, grave, great"); *see also Alvarenga-Canan,* No. 1:23-cr-00042-BLW, Tr. at 45 (Dkt. 26) (serious risk of flight is "something more than your garden-variety defendant, a weighty, substantial risk and not inconsequential and not average.").  Taken together, then, a "serious risk of flight" under § 3142(f)(2)(A) is a great risk – beyond average – that the defendant will intentionally and actively move within or outside the jurisdiction to avoid court proceedings or supervision.

The Government must demonstrate serious risk of flight by a preponderance of the evidence to trigger a detention hearing under § 3142(f)(2)(A).  *United States v. Friedman*, 837 F.2d 48, 49 (2d Cir. 1988); *Villatoro-Ventura*, 330 F. Supp. 3d at 1124; *White,* 2021 WL 2155441 at *7; *United States v. Djoko*, 2019 WL 4849537, at *2 (W.D. Wa. October 1, 2019). More finely put, this means that the Government must demonstrate that it is more likely than not that there is a serious *risk* that the defendant will flee, not that that it is more likely than not that the defendant *will* flee.  *See United States v. Duarte-Vela,* No. 2:23-cr-00009-TOR-1, Amended Order Following Status Hearing Regarding Detention and Detention Hearing at 7 (Dkt. 32) (E.D. Wa. Jan. 25, 2023); *Alvarenga-Canan,* No. 1:23-cr-00042-BLW, Tr. at 7 (Dkt. 26) ("It's got to be 51 percent of a serious risk.").  To do so, the Government must present "concrete information" not "mere conclusory allegations."  *White,* 2021 WL 2155441 at *7 (citing *United States v. Wright,* 2018 WL 3496642, at *2 (D. Utah July 20, 2018)); *see also United States v. Himler,* 797 F.2d 156, 160 (3d Cir. 1986) (detention warranted "only if the record supports" a

**MEMORANDUM DECISION AND ORDER - 9**

finding of serious risk of flight); *Subil*, 2023 WL 3866709 at *4 ("The § 3142(f) categories are not mere incantations that will conjure a hearing upon their simple utterance.  The Act requires that the Government make a factual showing to justify why it should be given a shot at detention.").  Applying this preponderance standard at the gatekeeping stage – and requiring that it be satisfied by concrete information in the record – gives full effect to the presumption of pretrial liberty that Congress and the Supreme Court intended in most cases.  *See Salerno,* 481 U.S. at 751 ("In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception.").[4]

    C.    <u>Factors to Consider in Immigration Cases</u>

The Ninth Circuit has provided a non-exhaustive list of primary factors that courts should consider in determining whether a defendant charged with violating § 1326 presents a *risk of non-appearance* under § 3142(g):

> Primary factors include [the defendant's] violation of the terms of his supervised release, his multiple unlawful entries into the United States, his prior failure to appear when required in state court, his use and possession of fraudulent identity documents, and the

---

[4] Elsewhere, the Government has taken the reasonable position that applying a preponderance standard at the gatekeeping stage would render a subsequent detention hearing superfluous, and that a lesser standard is appropriate.  Requiring the Government to prove a serious risk of flight by preponderant evidence to trigger a detention hearing under § 3142(f)(2)(A), the argument goes, would be cumulative of the hearing itself wherein the Government would have to prove a risk of non-appearance by the same burden.  The Court disagrees.  While it is true that preponderant evidence of the narrower serious risk of flight standard satisfies the broader risk of non-appearance standard, a detention hearing involves more than just demonstrating risk of non-appearance.  A detention hearing concerns whether "any condition or combination of conditions . . . will reasonably assure the appearance of such person as required and the safety of any other person and the community. . . ."  18 U.S.C. § 3142(f); *see Runsdorf*, 2022 WL 303548 at *4.  Thus, a defendant determined to be a serious risk of flight at the gatekeeping stage may nonetheless argue at the subsequent detention hearing that he or she should be released on conditions.  And the Government may present evidence of dangerousness not considered by the court at the gatekeeping stage.  *See United States v. Holmes,* 438 F. Supp. 2d 1340, 1351 (S.D. Fla. 2005); *Cobix-Espinoza*, 2023 WL 1860982 at *5.  Accordingly, a detention hearing following a § 3142(f)(2)(A) trigger is not superfluous, and a preponderance standard is appropriate.

**MEMORANDUM DECISION AND ORDER - 10**

severity of the potential punishment and the weight of the evidence
against him.

*United States v. Santos-Flores,* 794 F.3d 1088, 1092 (9th Cir. 2015).[5]  Certainly, these factors

also inform whether a defendant charged with violating § 1326 presents a *serious of risk of flight*

under § 3142(f)(2)(A).  But because risk of non-appearance and risk of flight are slightly

different concepts, *supra,* applying the *Santos-Flores* factors to risk of flight is more nuanced

and deserves additional examination.  *See, e.g, Cobix-Espinoza*, 2023 WL 1860982 at *2 ("The

difference between the general risk of nonappearance and the serious risk of flight, in some

contexts, is stark.  Certainly, the immigration context is one.").

Before it embarks on that examination, the Court addresses what it perceives as a

common misconception.  Namely, that alien defendants granted pretrial release are more likely

to fail to appear or flee than defendants who are United States citizens or lawful residents.[6]

Alien defendants who illegally enter this country, or illegally re-enter this country after removal,

do so for many reasons: to flee political persecution in their home country, to flee drug-related

violence in their home country, to pursue greater economic opportunity in this country, and to

follow friends or family members who already live in this country, just to name a few.  But they

share a common trait: they voluntarily chose to come to this country and stay here.  Presuming

that they are any more likely than non-alien defendants to leave this country or the jurisdiction to

avoid prosecution – just because they came here from another country – is misplaced.

Critically, this presumption is not supported by empirical proof.  According to a March

2022 United States Department of Justice, Bureau of Justice Statistics, Special Report, alien

---

[5] The Ninth Circuit also observed that "[a]lienage may be taken into account, but it is not
dispositive." *Id.* at 1090 (citing *United States v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985)).

[6] Herein, the Court uses the term "alien defendant" to refer to a person without lawful
immigration status in the United States who is charged with a crime.

**MEMORANDUM DECISION AND ORDER - 11**

defendants granted pretrial release were *less* likely to fail to appear or violate conditions of release than non-alien defendants.  *See* https://bjs.ojp.gov/content/pub/pdf/prmfdcfy1118.pdf. Collectively, for fiscal years 2011 through 2018, U.S. citizen defendants granted pretrial release (i) failed to appear at a rate of 0.9 percent; (ii) committed technical violations of conditions of release (*e.g.,* failed drug test or failure to maintain employment) at a rate of 20.0 percent; (iii) were rearrested for a new offense at a rate of 2.5 percent; and (iv) had their pretrial release revoked at a rate of 12.1 percent.  *Id.* at Table 9.  For the same period, documented non-U.S. citizen defendants (lawful permanent residents) granted pretrial release (i) failed to appear at a rate of 3.4 percent; (ii) committed technical violations of conditions of release at a rate of 12.6 percent; (iii) were rearrested for a new offense at a rate of 1.6 percent; and (iv) had their pretrial release revoked at a rate of 9.0 percent.  *Id.*  By contrast, for the same period, undocumented non-U.S. citizen defendants (alien defendants) granted pretrial release (i) failed to appear at a rate of 0.5 percent; (ii) committed technical violations of conditions of release at a rate of 1.6 percent; (iii) were rearrested for a new offense at a rate of 0.2 percent; and (iv) had their pretrial release revoked at a rate of 1.1 percent.  *Id.*

Against this backdrop, the Court analyzes the *Santos-Flores* factors, and other factors it deems most relevant, as they relate to serious risk of flight by an alien defendant.  The Court organizes these factors within four categories: (i) incentives to flee; (ii) ability to flee; (iii) ties to the jurisdiction and the United States; and (iv) reliability and trustworthiness of the defendant. *See* Gouldin, 85 U. Chi. L. Rev. at 703-04.  In assessing serious risk of flight, the Court considers these factors as part of the "totality of the evidence."  *Santos-Flores,* 794 F.3d at 1092. No one factor is dispositive.  Notably, the Court does *not* consider the prospect of the alien defendant's immigration detention or involuntary deportation if released from criminal custody. *See Santos-Flores,* 794 F.3d at 1092 ("We conclude that the district court erred in relying on the

existence of an ICE detainer and the probability of [defendant's] immigration detention and removal from the United States to find that no condition or combination of conditions will reasonably assure [defendant's] appearance pursuant to 18 U.S.C. § 3142(e)."); *United States v. Hernandez,* 943 F.3d 1196, 1199 (9th Cir. 2019) (holding that "the 'individualized evaluation' required by the Bail Reform Act does not include consideration of an immigration detainer or the possibility that the defendant, if released from criminal custody, would be held in immigration custody.").

       1.     <u>Incentives to Flee</u>

Broadly speaking, a defendant has an incentive to flee if he or she is facing a lengthy prison term and is likely to be convicted. *See Santos-Flores,* 794 F.3d at 1092. Consideration of the weight of the evidence against the defendant, as well as the range for imprisonment under the United States Sentencing Guidelines informs this analysis.

       a.     <u>Weight of the Evidence</u>

Under the Act, the weight of the evidence is the least persuasive factor. *United States v. Motamedi,* 767 F.2d 1403, 1408 (9th Cir. 1985) (citing *United States v. Honeyman*, 470 F.2d 473, 474 (9th Cir. 1972)). That is because any consideration of the weight of the evidence must acknowledge the defendant's pretrial presumption of innocence. *Id.* Notwithstanding the presumption of innocence, if the weight of the evidence against the alien defendant is objectively strong, the defendant may perceive a likelihood of conviction, giving him or her a greater incentive to flee.

Typically, in a § 1326 criminal prosecution, the weight of the evidence depends upon the integrity of the prior removal proceedings, the state of documentation within the defendant's Alien-File or "A-File," and the proof of identity of the defendant. However, validity of prior removals may not be collaterally attacked in a criminal prosecution without proof of prior

**MEMORANDUM DECISION AND ORDER - 13**

exhaustion of administrative remedies. *See* 18 U.S.C. § 1326(d) (in a criminal prosecution, an alien may not challenge the validity of a deportation order without demonstrating that: (i) he or she exhausted administrative remedies; (ii) the deportation proceedings deprived him or her of the opportunity for judicial review; and (iii) the entry of the deportation order was fundamentally unfair). Recently, the Supreme Court reinforced this statutory requirement. *United States v. Palomar-Santiago*, 141 S.Ct. 1615, 1620-22 (2021) (holding that statutory exhaustion requirement of § 1326(d) is mandatory; precluding defendant's collateral attack in § 1326 prosecution challenging DUI as an aggravated felony that justified removal). As a practical matter, this requirement makes § 1326 criminal prosecutions difficult to defend at trial. Accordingly, the weight of the evidence in most § 1326 prosecutions is strong.

b.   <u>Potential Punishment</u>

At the gatekeeping stage, a defendant's dangerousness is not a relevant consideration. *See supra, Twine,* 344 F.3d at 987; *Dillard*, 214 F.3d at 96. Thus, courts may not consider a defendant's criminal history as it relates to the likelihood of recidivism and threat to the community. However, courts may consider a defendant's criminal history at the gatekeeping stage insofar as it informs a Guidelines calculation of the defendant's prospective sentence if convicted. *See United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990) ("Consideration of the nature of the offenses charged involves consideration of the penalties.").

Under the Sentencing Guidelines, the extent of an alien defendant's potential punishment for violating § 1326 hinges primarily upon his or her prior criminal history. *See* United States Sentencing Commission, *Guidelines Manual,* § 2L1.2 (Nov. 2021) (hereinafter "USSG"). The base offense level for violating § 1326 is eight, one of the lowest base offense levels in the Guidelines. *Id.* at § 2L1.2(a). As such, alien defendants without significant criminal histories

often face a Guidelines range of imprisonment of between 0 to 6 months in prison, providing little incentive to flee standing alone.

The offense level increases substantially – from 2 to 10 levels – if the alien defendant was previously convicted of a felony offense or multiple misdemeanors while in the United States, either before or after deportation.  *Id.* at § 2L1.2(b).  In addition, an alien defendant accumulates criminal history points – and a higher criminal history category – for prior convictions within 10 to 15 years preceding the instant § 1326 offense.  *Id.* at §§ 4A1.1, 4A1.2(e).

Where an alien defendant has a significant criminal history, then, the higher offense level and criminal history category merge to result in a Guidelines range of imprisonment that is often years, not months.  Alien defendants facing sentences measured in years for violations of § 1326, to be followed by near certain deportation, have a far greater incentive to flee.

2.      Ability to Flee

An incentive to flee is distinguished from ability to flee.  Ability to flee involves the alien defendant's access to resources that would enable flight.  Resources include finances that could fund flight, access to fraudulent identity documents that could facilitate clandestine travel, and ties to persons outside of the jurisdiction who could assist flight.  *See Santos-Flores,* 794 F.3d at 1092; *see also* 18 U.S.C. § 3142(g)(3)(A) (factor of "financial resources").

An alien defendant who has access to significant sums of money – from either his or her own bank accounts, or those of immediate family members, or cash – has a greater ability to flee. *See United States v Aitken*, 898 F.2d 104, 107 (9th Cir. 1990) (holding that defendant was a flight risk in part because he had "access to large sums of cash").  Also, an alien defendant's prior possession or use of fraudulent identity documents demonstrates his or her potential access to the same, should he or she prospectively decide to flee.  Such documents allow a defendant – otherwise subject to court and law enforcement supervision under his or her real name – to flee

**MEMORANDUM DECISION AND ORDER - 15**

undetected.  *See, e.g., United States v. Miranda*, 2021 WL 493404, at *3 (N.D. Cal. Feb. 10, 2021).  And, of course, close friends or family in another jurisdiction or foreign country can facilitate flight by providing transportation and temporary or permanent housing there.  Frequent and recent foreign travel provides concrete evidence of ability to flee.

3.      Ties to the Jurisdiction and the United States

Arguably most significant in the "serious risk of flight" calculus – as distinguished from the "risk of non-appearance" calculus – is consideration of the alien defendant's ties to the jurisdiction and the United States relative to his or her foreign ties.  This fact-specific inquiry involves multiple factors: (i) length of residence in the jurisdiction and the United States; (ii) presence of family members in the jurisdiction and the United States; (iii) community ties to the jurisdiction and the United States; and (iv) ability to legitimately be employed and earn income in the United States.  *See Townsend*, 897 F.2d at 995 ("When assessing an alien defendant's ties to the United States, factors to be considered include how long the defendant has resided in this country, whether defendant has been employed in the United States, whether defendant owns any property in this country, and whether defendant has any relatives who are United States residents or citizens."); *see also* 18 U.S.C. § 3142(g)(3)(A) (factors of "family ties, employment . . . length of residence in the community, community ties . . .").

a.      Length of Residence

The length of residence in the jurisdiction and the United States, both uninterrupted and cumulative, bears significantly on serious risk of flight.  Alien defendants who have resided in the United States for many years are less likely to flee pending trial.  This is especially true for alien defendants whose length of residence in the United States approaches or exceeds their length of residence in their home country.  The longer an alien resides in the United States relative to the length of residence in their home country, the more that alien assimilates to

**MEMORANDUM DECISION AND ORDER - 16**

American culture and becomes more removed from the culture of their home country.  This makes it more likely the alien defendant will not flee in the face of § 1326 charges.  For instance, all other things being equal, a 30-year-old alien who has resided in the United States for 10 years generally would be less likely to flee than a 60-year-old alien who has resided in the United States for 10 years.  The 30-year-old alien has deeper roots in American culture relative to his or her home country.

  b. <u>Family Ties</u>

   The presence of close family members in the jurisdiction and the United States, relative to close family members who reside abroad, militates against serious risk of flight.  While there is no threshold number or exact formula, where the balance of an alien defendant's immediate family – parents, siblings, spouse, and children – reside in the jurisdiction and the United States, and the defendant maintains a close relationship with them, that alien defendant is less likely to flee than another alien defendant who lacks such familial anchors here.  The presence of immediate family members who are United States citizens – especially children – is particularly compelling.  Conversely, where the balance of an alien defendant's immediate family resides in their home country – and perhaps the alien defendant came to the United States simply to avail himself or herself of economic opportunity to support his or her family abroad – flight is more likely.

  c. <u>Community Ties</u>

   Like family ties, community ties are predictive of serious risk of flight.  An alien defendant with a strong and well-defined network of friends, neighbors, co-workers, and parishioners in the jurisdiction and the United States presents a lesser risk of flight than an alien defendant without such a network.  Like immediate family, these persons, and the community institutions they represent (employer, neighborhood, church, synagogue, or mosque, etc.), are

**MEMORANDUM DECISION AND ORDER - 17**

anchors to the jurisdiction and the United States.  They can provide the alien defendant with the

needed moral, emotional, religious, and financial support that allow him or her to remain here

through trial.  Likewise, an alien defendant's ownership of property or business interests in the

community further attaches him to the jurisdiction.  The alien defendant stands to lose these

tangible items of value if he or she flees, thus discouraging flight.

d.    <u>Employment and Income</u>

Typically, a defendant's employment in the jurisdiction supports an argument that he or

she will not flee.  *See* 18 U.S.C. § 3142(g)(3)(A) (factor of "employment").  However, alien

defendants cannot lawfully be employed and earn income in the United States.  *See* 8 U.S.C. §

1324a; 8 C.F.R. 274a.10(b)(1).  For alien defendants, this cuts both ways.  On the one hand, the

alien defendant might seek to flee if released because he or she no longer has a source of

legitimate income.  And supervision by court, law enforcement, and immigration authorities

frustrates illegitimate employment and income.  For many, this removes the primary incentive to

remain in the United States: economic opportunity.

On the other hand, absent employment and income, the alien defendant might not have

the means to flee.  Flight, either within the jurisdiction or not, requires funds: an alien defendant

must travel to the new locale, find temporary or permanent housing there, and pay for the

necessities of life.  If flight is within the jurisdiction or the United States, he or she must do so

surreptitiously to avoid arrest.  This forecloses public assistance.  For these alien defendants,

flight may not be practicable.  *See* Gouldin, 85 U. Chi. L. Rev. at 710 ("While defendants [with

lesser financial resources] may pose risks of nonappearance, their socioeconomic status makes it

unlikely that they could flee from the jurisdiction. Successful flight from the jurisdiction suggests

access to networks and resources that are not part of the equation for the vast majority of

nonappearing defendants.").

**MEMORANDUM DECISION AND ORDER - 18**

In many cases, whether an alien defendant can afford to stay in the United States if released pending trial depends on the availability of financial support from other legitimate sources – personal savings or from family, friends, or charity – measured against the length of the term of pretrial release.  On balance, then, the absence of prospective employment and income may be probative of serious risk of flight, unless the alien defendant demonstrates other means of legitimate financial support through trial or other disposition of the charge.

4.    <u>Reliability and Trustworthiness of the Defendant</u>

An alien defendant who flees after pretrial release makes the intentional choice to disregard a court-ordered condition of release, namely, that the defendant not leave the jurisdiction without permission and appear for court as required.  Accordingly, prior instances of disregarding or violating court orders may be predictive of flight insofar as they demonstrate that the defendant is not reliable or trustworthy.  Critically, however, the predictive value of prior violations of court orders depends on the type of order violated and the context of the violation.

a.    <u>Multiple Illegal Reentries After Removal</u>

Certainly, an alien defendant's illegal reentry into the United States after removal is indicative of his or her general disregard for the law and court order.  When an alien is deported from the United States, he or she is typically advised that it is a federal crime to return without permission of the Attorney General.  Accordingly, when that alien subsequently reenters the United States without permission, he or she knowingly and intentionally violates a court order, as well as federal criminal law.  Multiple illegal reentries after removal demonstrate greater disrespect for court orders and the law.  *See Cobix-Espinoza*, 2023 WL 1860982 at *9 ("the nature of the [alleged] crime—returning to the United States, despite prior removal from this country by court order—indicates [the defendant] is not disposed to follow the orders of this Court . . . . This is especially true here, as [defendant] was removed from this country on three

**MEMORANDUM DECISION AND ORDER - 19**

separate occasions.") (quoting *United States v. Aleman-Duarte*, 2020 WL 236870, at *5 (E.D. Tenn. Jan. 15, 2020)).

Accordingly, multiple illegal reentries plainly are predictive of non-appearance. However, they are less predictive of flight. That is because illegal reentries simultaneously demonstrate the alien defendant's disregard for court orders and the criminal law *and* his or her strong desire to remain in the United States. Indeed, the very act of illegally reentering the United States – knowing that reentry subjects the alien defendant to a potential prison term and certain deportation thereafter – demonstrates a firm resolve to reside in this country, especially when done multiple times. As such, the Court construes multiple illegal reentries, standing alone, only as modest proof of serious risk of flight.

> b.   Prior Violations of Terms of Supervised Release, Probation or Parole

A defendant's prior violation of terms of supervised release, probation or parole indicates his or her disregard for court orders, and in some cases, the criminal law. Generally, such violations are predictive of flight. But again, such violations must be evaluated contextually.

The type of violation matters. Violations that are the result of premeditated, conscious choices to avoid supervision and contact with supervising authorities are most predictive of flight. Violations that can be explained by negligence or untreated addiction to controlled substances are less so. For instance, multiple unexplained failures to appear for drug testing or for substance abuse counseling, tampering with a drug test, or unexplained and routine failures to report to a probation officer are predictive of flight. Such violations involve intentional choices to avoid accountability; a defendant who makes these choices may also choose to flee. Conversely, isolated and explained failures to appear for testing or treatment or to report to a probation officer, and positive drug tests prior to treatment or counseling, are less predictive of

**MEMORANDUM DECISION AND ORDER - 20**

flight.  Such violations involve mistakes or impaired judgment; a defendant who makes such mistakes or exhibits poor judgment is less likely to actively flee.

          c.      <u>Prior Failures to Appear</u>

Prior failures to appear are strongly predictive of flight.  Generally, they indicate a defendant's disregard for court orders.  Specifically, they indicate a defendant's disregard for a court order to appear for court proceedings at a designated time and place, typically given with significant advance notice.  Due to the advance notice, failures to appear most often are intentional.  This is especially true if a defendant has more than one in his or her past, or no legitimate excuse was proffered contemporaneous with the failure to appear.  Hence, where a defendant has one or more unexplained prior failures to appear, a court may extrapolate that he or she may make a similar, intentional choice to flee to avoid prosecution.

          d.      <u>Substance Abuse</u>

Finally, substance abuse is a reliability and trustworthiness category unto itself. Defendants who abuse alcohol or controlled substances often have impaired judgment and impeded facilities when they are using.  Moreover, their illegal use of controlled substances demonstrates their general disregard for the criminal law.  Such defendants, then, are less reliable and trustworthy, and accordingly, are less likely to appear for court.  *See* 18 U.S.C. § 3142(g)(3)(A) (factor of "history relating to drug or alcohol abuse").  But it does not follow that they are considerably more likely to flee.

Flight requires a coherent and well-funded plan: upfront finances, transportation to the new locale, housing at the new locale, a new source of income, and perhaps a new identity. Defendants who abuse substances often do not have access to these resources.  Indeed, many spend large portions of their disposable income on the substances they abuse, leaving little to fund flight.  Moreover, they may be unwilling to leave the locale of their source of supply only to

**MEMORANDUM DECISION AND ORDER - 21**

have to find a new one.  Some rely on public assistance that would effectively preclude flight.

Accordingly, the Court views substance abuse as only marginally predictive of flight.

III.   <u>Analysis</u>

In its Motion for Detention, the Government requests a detention hearing, alleging that

Defendant is a serious risk of flight under § 3142(f)(2)(A).  *See* Dkt. 5 at 2-3.  The Government

argues that (i) Defendant is unwilling to follow court orders, having been removed from the

United States on four occasions; (ii) Defendant illegally reentered the United States after those

removals, having been warned that doing so was a federal crime; and (iii) the weight of the

evidence against Defendant – including his admission to the crime – is strong.  *Id.*  Following on

its request for a detention hearing, the Government further argues that Defendant should be

detained pretrial because there is preponderant evidence that he is a risk of flight.  *Id.* at 4-8.  In

making this argument, the Government proffers facts in support of the § 3142(g) factors.  *Id.*

The Court considers these facts, and those proffered at the hearing, in performing its gatekeeping

function.

Based upon the record before the Court, however, the Government has not demonstrated

by a preponderance of the evidence that Defendant poses a serious risk of flight.  First, there is

scant evidence that Defendant has an incentive to flee.  The Government points to the weight of

the evidence against Defendant.  *Id.* at 3, 5.  No doubt, it is strong because of Defendant's

multiple removals and illegal reentries, coupled with his admission to the crime.  *Id.*

Conspicuously absent, though, is an analysis of the potential sentence Defendant faces if

convicted.

Defendant has a limited criminal history: prior convictions for three misdemeanors and

one infraction.  Three of those convictions – the 2014 and 2015 failures to purchase a driver's

license and 2016 open container by a passenger infraction – do not generate criminal history

**MEMORANDUM DECISION AND ORDER - 22**

points because Defendant was not sentenced to probation for one year or more or a term of imprisonment of at least 30 days. *See* USSG § 4A1.2(c)(1). Indeed, Defendant's criminal history generates only *one* criminal history point in total. This results from his 2019 illegal entry conviction and concomitant 30-day prison sentence. *See id.* at § 4A1.1(c). Accordingly, Defendant falls within criminal history category I.

At criminal history category I, should Defendant be convicted of violating § 1326, he would face a guidelines range of 0 to 6 months in prison. *See id*. at § 2L1.2(a) & Sentencing Table. This is true whether Defendant pleads guilty pursuant to a "fast-track" plea agreement (and receives a 2- to 4-level offense level reduction) or a standard plea agreement (and receives a 2-level offense level reduction for acceptance of responsibility) or is convicted at trial (and receives no offense level reduction). *See id*. Such an insignificant potential sentence provides Defendant with little incentive to flee the jurisdiction to avoid the instant prosecution.

Second, the Government presented no evidence of Defendant's ability to flee. There is no indication that Defendant has access to significant financial resources that would enable his flight. Indeed, Defendant proffered that he has only $4,500 in savings. Likewise, the Government suggested he has limited funds if unable to work. Dkt. 5 at 7 ("Without the ability to work in the United States, the Defendant must presumably rely on others to provide for his daily needs . . . .").

Nor did the Government adduce evidence that Defendant has access to fraudulent identity documents. While Defendant was arrested in 2009 for failure to purchase a driver's license and providing false information to law enforcement, there is no evidence in the record that the false information involved fraudulent identity documents. In any event, the charges were dismissed. No other evidence was offered concerning Defendant's prior possession or use of fraudulent identity documents.

**MEMORANDUM DECISION AND ORDER - 23**

Finally, there is no evidence in the record of Defendant's recent travel outside of the United States.  Notwithstanding parents and siblings who reside in Mexico, the Court will not presume Defendant has visited them without tangible evidence.  As such, proof of Defendant's ability to flee is wholly lacking.

Third, Defendant has significant ties to Idaho and the United States.  For approximately 16 years, Defendant has resided in Eastern Idaho.  As such, Defendant has lived nearly half of his life – and the most recent half – in Idaho and the United States.  Upon the record before the Court, his 16-year residence in the jurisdiction has been interrupted only by his four removals. While the Government is correct that his reentries after these removals demonstrate Defendant's disregard for court orders, and his knowing flaunting of criminal immigration laws, they equally demonstrate his resolve to remain in Idaho and the United States.  Taken together, Defendant's lengthy residence and reentries militate against flight.

Likewise, Defendant has strong family and community ties that anchor him to Idaho and the United States.  Crucially, Defendant has three children who live in Rigby with their mother. They were born in the United States and are United States citizens.  Defendant has visitation rights and pays monthly child support.  Moreover, he lives with his girlfriend of 5 years in Idaho Falls, where she owns a residence.  Further, his brother-in-law legally resides in the United States.  While it is true that Defendant's parents and siblings theoretically could provide refuge in Mexico, there is little to suggest Defendant would abandon his children and girlfriend.[7]

---

[7] The Government asks the Court to disregard Defendant's family and community ties and length of residence in the community because Defendant will be deported after prosecution, and thus, has an inherent incentive to flee.  *See* Dkt. 5 at 5 ("His prior community ties to the United States, no matter how substantial they might have been, were severed.  He would be released as someone without authority to be in the United States and knowing he has a high likelihood of conviction and deportation. Therefore, there is little incentive for the Defendant to return to Court."); *id.* at 6 ("But, in this case, the only way the Defendant could continue to reside with his relatives in the United States is by failing to appear in Court and by remaining in

Prior to his instant arrest, Defendant worked three years for a paving company in Idaho Falls.  The Government appropriately argues that Defendant prospectively may not legally be employed or earn income in the United States.  But again, this cuts both ways.  It may provide him an incentive to flee because economic opportunity could be the primary reason he resides here.  Or it may effectively preclude his flight because he lacks the means to flee, holding only $4,500 in liquid funds.  This tension remains unresolved.

Importantly, however, Defendant's trial date is close on the horizon.  It is set for August, 21, 2023.  Continuances of trial dates in § 1326 cases are rare, given the limited discovery and discrete legal and factual issues at play.  Given this condensed pretrial period – approximately 7

---

the country illegally. Because the Defendant's family and community ties to the United States do not provide an incentive to return to court, this factor weighs in favor of detention."); *id.* at 7 ("The fact that a Defendant may have put together years in the United States before or between being deported is not a factor supporting bail because the chance to continue that residence is effectively zero.").  The argument is misplaced and rests upon a faulty premise.  Namely, that alien defendants present a greater risk of flight in a criminal case because of their near certain deportation after prosecution.  Again, the DOJ's own statistics do not bear this out: released alien defendants fail to appear at a *lower* rate than U.S. citizen or LPR defendants.  *See supra,* DOJ Special Report at Table 9.  Moreover, the argument is a vestige of cases that predate *Santos-Flores* and *Hernandez* which collectively require that courts conduct an individualized assessment of a defendant's circumstances and preclude consideration of involuntary deportation.  *See Santos-Flores,* 794 F.3d at 1091-92; *Hernandez,* 943 F.3d at 1199; *see also Alvarenga-Canan,* No. 1:23-cr-00042-BLW, Tr. at 17-18 (Dkt. 26) ("I think the case law is very clear that I cannot and must not consider the fact that he may well be deported or will be deported if he is released. That's just not a relevant consideration.").  Finally, the argument flies in the face of the facts of this case.  Namely, after his first removal in 2011, Defendant was charged with crimes on multiple occasions and had the same alleged incentive to flee from prosecution and prospective deportation.  Yet, as set forth *infra,* he never did.  Plainly, then, this Court can and should consider family and community ties and length of residence – divorced from any consideration of prospective deportation – in determining whether alien defendants pose a serious risk of flight.  *See, e.g., United States v. Miramontes-Maldonado*, No. 1:19-CR-00060-BLW, 2019 WL 1560875, at *2 (D. Idaho Apr. 9, 2019) ("But the Government's arguments [that the alien defendant was likely to flee] ignore [defendant's] lack of serious criminal history, his significant ties to the region, and strong family and community support, all of which suggest at least as strongly that he is not a 'serious flight risk.'").

**MEMORANDUM DECISION AND ORDER - 25**

weeks – it seems unlikely that Defendant would flee simply because he cannot legally work during this interim.

Fourth, based upon the record before the Court, Defendant has shown that he is generally reliable and trustworthy.  To be sure, Defendant's four illegal reentries after removals demonstrate his disrespect for the law.  But again, they are less probative of his serious risk of flight at this stage than they would be for his risk of non-appearance at a later detention hearing. More probative of serious risk of flight is the absence of any failures to appear or other pretrial or post-trial violations in his criminal history.

On four occasions, Defendant was encountered by law enforcement during traffic stops and was charged with misdemeanors and an infraction.[8]  Presumably, each time, he was not arrested, but rather, was summonsed to appear for a subsequent court date.  Certainly, at these court dates, the same specter of deportation loomed as is alleged here.  Yet, dutifully, he appeared in court in each case.  The 2009 case was dismissed.  He was convicted in the 2014, 2015, and 2016 cases, sentenced to pay fines, and he paid them.  No record evidence exists that Defendant violated any pretrial or post-trial conditions associated with these cases.  Given this track record of appearance and compliance in prior criminal proceedings, there is little to suggest that Defendant poses a serious risk of flight in this criminal case where he faces a similarly insignificant sentence.

<u>Conclusion</u>

The Bail Reform Act does not categorize illegal reentry after removal as a serious crime. As such, it requires the Government to show that the alien defendant is a serious risk of flight before a detention hearing, at which his or her pretrial liberty would be at stake, is even

---

[8] In June 2023, Defendant was arrested for DUI in Bonneville County and has remained in custody since.

**MEMORANDUM DECISION AND ORDER - 26**

authorized.  The serious risk of flight standard is different in quantum and character from the standard that applies at any later detention hearing: namely, whether there are conditions or a combination of conditions that will reasonably assure the defendant's appearance as required and the safety of any other person and the community.  Instead, the serious risk of flight standard requires an individualized assessment and the presentation of concrete information that demonstrates that the alien defendant poses a great risk that he or she will intentionally and actively move within or outside the jurisdiction to avoid court proceedings or supervision.  That standard was not satisfied here, and thus, no detention hearing is warranted.

Accordingly, IT IS HEREBY ORDERED THAT the Government's Motion for Detention (Dkt. 5) is DENIED;

IT IS FURTHER ORDERED THAT Defendant be released pending trial based on conditions set forth in a separate Order of Release filed in connection with this decision.

DATED:  July 3, 2023

_____
Honorable Raymond E. Patricco
Chief U.S. Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 27**